UNITED STATES DISTRICT COURT

DISTRICT OF NEW JERSEY

---

| | |
|---|---|
| **KAMYAR MOFID,** | CIVIL ACTION NO: |
| *Plaintiff,* | |
| **v.** | |
| **SUNTUITY RENEWABLES LLC, and SHADAAN JAVAN,** | <u>**Filed Electronically**</u> |
| *Defendants.* | |
| | VERIFIED COMPLAINT AND JURY DEMAND |

---

Plaintiff Kamyar Mofid ("Mofid" or "Plaintiff") by his attorneys Pashman Stein Walder Hayden PC and Rukab Brash PLLC, for his Verified Complaint against Defendants Suntuity Renewables LLC ("Suntuity" or the "Company") and Shadaan Javan ("Javan") (collectively, "Defendants") alleges as follows:

## <u>LOCAL CIVIL RULE 10.1 STATEMENT</u>

Pursuant to Local Rule 10.1, the names and mailing addresses of all parties to this action are as follows:

Kamyar Mofid (Plaintiff)
3052 N. Snow Canyon Pkwy, Unit 9, St. George, UT 84770

Suntuity Renewables LLC (Defendant)
2137 Route 35 N, Holmdel, NJ 07733

Shadaan Javan (Defendant)
c/o Suntuity Renewables LLC
2137 Route 35 N, Holmdel, NJ 07733

4882-2085-9032, v. 1

**STATEMENT OF CLAIMS**

1.     In the fall of 2021, Mofid, who had been a senior executive for numerous, prominent manufacturing and technology companies for the past two decades and has had a distinguished engineering and leadership career spanning nearly 35 years, was induced to join Suntuity, as a chief strategy officer ("CSO") by its chief executive officer ("CEO"), Javan.

2.     During the wooing process, Javan boasted about the status of Suntuity's business verticals, the multiple successful companies comprising the "Suntuity Group" and his successful track record as an executive with other start-up companies.

3.     Javan promised Mofid that if he joined Suntuity, he would receive not only a significant base salary, and generous annual bonuses (which would increase significantly over the next 12 months), but a 1% equity interest in the Company, along with other perks.

4.     Persuaded by Javan's slick presentation and representations (which turned out to be exaggerated or outright false), Mofid agreed to join the Company in October 2021 as CSO, entering into a written agreement on October 4, 2021 (the "Agreement").

5.     Among the provisions in the Agreement, the Company promised to pay Mofid a base salary of $360,000, an annual bonus of up to 50% of the base salary, and an "equity participation for your role as CSO up to 1%" pursuant to an equity participation agreement to be delivered to Mofid within 60 days of his start date. Javan understood that historically Mofid's compensation, due to his extensive executive background and expertise, were at much higher levels, and he stated to Mofid - during the hiring process - that he could expect (due to the Company's strong growth and financial results) an increase in his base salary to $500,000 and an annual bonus target of 100% ($500,000) within a year.

6.      The Agreement also included a severance provision, providing that if the Company terminated Mofid's employment without cause, or if he resigned for good reason, the Company would pay him "one year of his then current gross base annual salary, plus a continuation of then available Company-offered health benefits for that one year."

7.      Soon after joining the Company, Mofid was dismayed to learn that he had been sold an illusion, a false bill of goods – Suntuity was not the sophisticated, successful, global company that Javan represented but a small, local solar business that had no meaningful established processes and capable systems. The Company's accounting, IT, and inventory management systems were primitive and grossly ineffective. The Company did not have financial statements or a clear understanding of its revenues or costs even though Javan had portrayed the Company as a sophisticated global enterprise. Furthermore, the various business segments that Javan had described to Mofid which he claimed were successful business activities in Net-Zero Home Construction, in Global Sourcing and Logistics, and in Aerial Drones were virtually nonexistent despite the fact the public websites of the Company were touting these entities as major businesses with extensive depth and breadth and market reach.

8.      In fact, the "Suntuity Group" of companies were not large, successful companies but essentially empty shells - the only real business was Suntuity's residential solar company that, for all practical purposes, was a relatively small company operating primarily in the Northeastern states despite the Company's' claims that Suntuity was a major national player with a growing solar business including substantial presence in US Virgin Islands (which was also not true).

4882-2085-9032, v. 1

9.      In short, Javan had grossly misrepresented the Company's financial health and business operations to Mofid who relied on those representations and abandoned his pursuit of other opportunities to join Suntuity.

10.      Despite his disappointment and grave concern about the viability of the Company, and the fact that Mofid had "good reason" (as defined in the Agreement) to terminate the Agreement, Mofid told Javan he would stick around and help him "clean up" the Company, create a proper and a professional operation, and help create a valuable company. Mofid's commitment to stay the course and help the Company only happened after a meeting with Javan on or around January 18, 2022 (only a few weeks after he had joined the Company) in which Mofid described Javan's misrepresentations in inducing him to join the Company and demanded full transparency and integrity moving forward to which Javan agreed.

11.      For the next 18 months, Mofid fully committed himself to this task, working tirelessly on business planning and business process improvements, and helping create a strong and cohesive leadership team including taking a key role in recruiting critical leadership talent such as a chief financial officer, VP of Sales, VP Of Operations, a chief administrative officer, etc. Per Javan's request, as part of creating a strong and effective capital foundation for investment and growth, Mofid also met with a number of investment banking firms, and ultimately the Company engaged an investment bank to help address the Company's capital needs.

12.      Mofid's hard work started to show dividends both in terms of more discipline and professionalism in sales and operations planning and execution and in engaging in some meaningful conversations with potential investors. The Company was presented with a number of potential investment scenarios including going public through a de-SPAC transaction

4

with Beard Energy Transition Acquisition Corporation. Javan decided to focus on the de-SPAC scenario and abandoned other investment opportunities.

13.     In May 2023, the Company, and Beard Energy Transition Acquisition Corp. ("Beard"), a special purpose acquisition company, entered into an agreement that would eventually result in Suntuity becoming publicly traded.

14.     Then, in September 2023, Javan told Mofid that he was going to terminate Mofid's employment, telling him that it was not performance related but that he wanted to focus on "cost-cutting and down-sizing."

15.     On September 22, 2023, Mofid was presented with a separation letter, signed by the Company's HR director, which reiterated the Company's promise to pay Mofid severance for one year and incorrectly stated that Mofid had equity in the amount of 0.5% (instead of the promised 1%).

16.     Then, on or about November 2, 2023, after the Company made two severance payments to Mofid (in October 2023), Mofid received a phone call from the Company's Chief Administrative Officer ("CAO") informing him that because the Company had "financial challenges" it would not make any more severance payments. The CAO also advised Mofid that she did not know if and when the severance would ever be paid.

17.     Mofid's severance payments are not of material importance to the Company's financial situation one way or another and the  Company's claim of financial inability to pay his severance is another misrepresentation, evidenced by the fact that in the period immediately after terminating Mofid, the Company continued to advertise online for new hires in various levels and hired a number of highly compensated executives such as a new CRO (Chief Revenue Officer), a new SVP of Operations, and a new General Counsel among others.

4882-2085-9032, v. 1

18.     Also, in approximately the same period Javan apparently also purchased/leased a private plane for his personal enjoyment.

19.     Extremely distressed, Mofid spent the next few weeks, after November 2nd, attempting to speak with Javan, the Company's general counsel and Greg Beard, the principal of Beard, who is also a Suntuity board member, to try and resolve this matter amicably.

20.     However, the Company refused to discuss this matter, leaving Mofid no choice but to commence this action to compel the Company to comply with its contractual obligations.

## THE PARTIES

21.     Plaintiff is an individual who resides at 3052 N. Snow Canyon Pkwy, Unit 9, St. George, Utah 84770.

22.     Defendant Suntuity is a corporation organized and existing under the laws of the state of New Jersey, with its corporate office at 2137 Route 35 N, Holmdel, New Jersey 07733.

23.     Defendant Javan is the CEO of Suntuity.

## JURISDICTION AND VENUE

24.     This Court has subject matter jurisdiction pursuant to 28 USC §1332(a)(1) because this is a civil action between citizens of different states and the amount in controversy exceeds the sum of $75,000, exclusive of interests and costs.

25.     Venue is proper in this judicial district pursuant to a provision in the Agreement that requires any litigation concerning the Agreement be brought in the state or federal courts in New Jersey.

4882-2085-9032, v. 1

**FACTS COMMON TO ALL CAUSES OF ACTION**

26.     Mofid is a highly regarded senior executive who has worked at some of the world's largest automotive, aerospace, and clean energy firms with recognition and distinction. Over the past two decades, Mofid has also been a C-suite executive at various cleantech firms nationally and internationally.

27.     In February 2021, Mofid retired from Envision Digital, a subsidiary of Envision Group, a leading global clean energy company, where he was the head of solar energy business unit globally. Although Mofid had retired from Envision, the company CEO had asked him to stay on as a paid advisor to the company.

28.     After retiring from Envision, Mofid's plan was to pursue board and advisory positions and build a successful consulting business given his extensive depth and breadth of expertise in business management, and in clean energy and electrification.

29.     Around the same time that he was considering his various options, Mofid was contacted by a corporate headhunter about an opportunity at Suntuity. The headhunter described Suntuity as an up and coming global solar and technology company with great depth and breadth of capabilities in multiple verticals run by a visionary founder who needed a seasoned senior executive partner to take his successful businesses to the next level.

30.     Intrigued by the prospect of joining a growing company, Mofid and Javan had multiple phone calls and met a number of times over video calls to discuss the Company's current operations, its future plans and Mofid's prospective role.

31.     Prior to joining the Company, Mofid informed Javan that he had a number of exciting and lucrative other opportunities but was intrigued by the prospect of joining Suntuity given what Javan had described and what the Company had also publicly stated regarding Suntuity

Group businesses. Mofid also stated to Javan that he had no interest in joining a traditional residential solar sales and installation company, if there was no broader vision and existing capabilities in software, technology, and electrification.

32.     Javan was persuasive, painting a rosy picture of the opportunities at Suntuity, including representing the Company as a large solar company with a substantial national footprint and a number of other business units with strong and highly synergistic capabilities. He insisted to Mofid that Suntuity was not just about residential solar sales and installation but had strong capabilities across software, technology, and project finance.

33.     In addition to describing various Suntuity Group's business segments to Mofid at some length, Javan also pointed him to the Company's various websites starting with "Suntuity Group" as shown below.

34.     These websites were all taken down by the Company in or around early 2023. A key reason the Company took down all those other websites (other than the Company's basic residential solar business website which was renamed to www.suntuityrenewables.com) is that once Mofid discovered those websites were misleading and contained materially false information, he insisted to Javan that the Company must not misrepresent its competencies and market reach. The snapshot of those old websites (which were all in place when Mofid joined the Company in October 2021) are from "Wayback Machine", a digital archive of the World Wide Web founded by Internet Archive, a non-profit firm.

35.     A snapshot of "Suntuity Group" as shown below portrays a sophisticated multi-vertical Company which in reality was materially false. For all practical purposes, these were just empty shells with the only real business being the residential solar sales and installation.



Source: Suntuity Group Website Based on "Wayback Machine" snapshot from August 2021

https://web.archive.org/web/20210825001917/https://suntuitygroup.com/.

   36. Suntuity Group's website grossly misrepresented the Company – there was

no real operating "sourcing division," there was no real operating "financing division," there was

no meaningful activity in the company's UAV division. In fact, the vast majority of what Javan

had told Mofid about the Suntuity group of companies were falsehoods, not only deceiving Mofid but Suntuity's customers, vendors, and the public.

      37.    For instance, Javan represented to Mofid that "Suntuity Airworks" was a world class drone company, which was described on the website as:





Source: Suntuity Airworks Website Based on "Wayback Machine" snapshot from August 2021

https://web.archive.org/web/20210811153856/https://suntuityairworks.com/

4882-2085-9032, v. 1

38.     Shortly after Mofid joined the Company in October 2021, he discovered Suntuity Airworks had one remote employee, no business plan, no budget, and little to no revenue (other than very minor spare part sales). When Mofid tried to change that through a strategic planning process to grow that business he realized Javan had neither the interest nor the capital to invest. Suntuity Airworks was an empty shell and what was advertised publicly was gross exaggeration if not an outright lie.

39.     Similarly, the capabilities and market reach of a number of other advertised business units of Suntuity Group were also vastly fabricated. Suntuity Sourcing, for instance, a business segment that Mofid was excited to help grow when he joined the Company had a website that was vastly false. Below is a high-level description of how the company introduced "Suntuity Sourcing" on its website.

## About Suntuity Sourcing

Suntuity Sourcing is the global procurement division of the Suntuity Group of companies, a conglomerate of renewable energy, finance, technology and UAV service companies that has developed, built and managed assets for 250+ megawatts of energy projects around the globe. Founded in 2008 and headquartered in Holmdel, New Jersey, the Suntuity Group currently operates in 8 countries and 10 US states.

Suntuity Sourcing provides a full suite of solar and UAV procurement, logistics and delivery services for its clients that aren't as financially attainable in the mainstream marketplace.

Source: Suntuity Sourcing Website Based on "Wayback Machine" snapshot from September 2021 https://web.archive.org/web/20210922150825/https://suntuitysourcing.com.

40.     In fact, as Mofid discovered once he joined the Company, its sourcing and logistics operations were manual and primitive and prone to on-going mistakes. Although the Company did not even understand how much inventory it had and where and how to effectively manage logistics, it publicly claimed to be excellent in these areas.

11

41.     Unaware of the true picture and relying upon Javan's representations concerning the Company's capabilities and successes in multiple synergistic business verticals and its great future prospects, Mofid agreed to join Suntuity Group as CSO.

**The Agreement**

42.     On October 4, 2021, Mofid entered into an Agreement with the Company, which provided," [a]s CSO, you will collaborate with the CEO and have input and assist with the execution of strategic business decisions and initiatives." (A copy of the Agreement is annexed hereto as **Exhibit A**.)

43.     The Agreement also stated that, "[d]uring the first twelve (12) months of employment with the Company, you will have the right of first refusal for the Chief Operations Officer ("COO") position with the Company if such a position is requisitioned by the Company.

44.     With respect to Mofid's compensation, the Agreement provided:

> As CSO, your gross base annual salary will be $360,000.00.
> You will also be eligible for equity participation for your role
> as CSO up to 1.00% (one percent). The allocation and vesting
> schedule of such equity is dependent upon your actual position
> start date and tenure as CSO and will be formalized in an
> equity participation agreement within sixty (60) days of your
> start date in the position. You will not be entitled to any portion of
> allocated but not yet vested equity should you resign without
> good reason or be terminated for cause from your employment with
> the Company prior to the vest dates set forth in Chart 1 and Chart 2.

45.     Per Chart 1 of the Agreement, Mofid is entitled to 1% equity participation in the Company if he is terminated without cause or resigned with good reason.

46.     The Agreement also contained a severance provision stating that, "should the Company terminate your employment without cause, or you resign for good reason, you will be eligible for severance pay equivalent to one year of your then current gross base annual salary, plus a continuation of then available Company-offered health benefits for that one year.

12

47.     The Agreement also included a Change of Control provision stating:

Upon a change of control, which shall not include an organizational
restructuring plan … all unvested equity interests will vest on the
closing of the change of control and be paid to you upon such closing.
For purposes of this agreement, "change of control" means (a) a new
or existing shareholder currently owning less than 10% of shares of
the Company becoming a majority shareholder, (b) the Company or any
of its subsidiaries having an Initial Public Offering ("IPO"), or the
acquisition or divestiture of a business unit of the Company where the value
of such acquisition or divestiture is in excess of 25% the value of the Company,
as such value is determined in the latest valuation made pursuant to IRS Code
409A.

**Mofid's Commencement of Work**

48.     Mofid started working for Suntuity on or about October 11, 2021. Although

he worked primarily out of his home in Utah, he traveled regularly to meet with Javan and the rest

of the management team in New Jersey.

49.     Within a few weeks of joining the Company, Mofid became alarmed,

learning that Javan's representations regarding the overall health, status, and scope of the business

were grossly exaggerated or, in other cases, false.

50.     Specifically, Mofid learned that: (i) Javan's claim that Suntuity was a global

solar player was false; (ii) the Company's public assertions that the "Suntuity Group of companies

is a conglomerate of global renewable energy, finance, technology and UAV service companies"

were materially false; (iii) the Company had little to no technological capabilities or IP -- its UAV

(drone) business had one employee with no meaningful business activity; (iv) the Company had

no staff or a balance sheet in its "Finance" division to actually finance anything; (v) the Company's

representation regarding sourcing – that it was a  comprehensive procurement and logistics service

provider to other smaller solar companies - was materially false; and (vi) the Company had very

poor and very primitive approach to inventory management and logistics.

51.     In addition, the Company's claim on its website that "Suntuity Home" is now building homes that are 'net zero' to reduce harmful carbon emissions and encourage sustainability and energy efficiency through construction of roofs, walls, windows are foundations that are well insulated" was another misrepresentation. Suntuity Homes had little to no capabilities to design and construct Net Zero homes as a normal profit-driven business activity.

52.     On information and belief, the only home "Suntuity Home" actually built was Javan's personal home.

53.     On or about January 18, 2022, only a few weeks after Mofid had joined the Company, he spoke with Javan and relayed his serious concerns regarding the misrepresentations Javan made to induce Mofid to join the Company. Mofid told Javan in no uncertain terms that he (Javan) had to "clean up his act."

54.     In addition, during that January 2022 call, Mofid also discussed certain business outcomes that Javan represented would be in place by the end of October 2021 (i.e., the month Mofid joined the Company). Specifically, Javan had represented to Mofid that by the end of the month (October 2021) the Company will "close on a 100MW+ utility scale project which the Company will build and manage" and the Company will also have its own "$100 million residential project finance fund in place" – neither of these ever happened.

55.     In late October 2021, Mofid spoke to the then VP of Finance (Hector Pena) who was overseeing the 100MW project and the $100 million financing. Mr. Pena, who resigned from the Company in the fourth quarter of 2021, told Mofid that the Company had no financial means to be able to close such transactions, that Javan had misled him in believing Suntuity had the capital means to pursue such transactions, and that Javan was a "habitual liar.".

56.     Among Mofid's concerns, relayed to Javan in January 2022, and subsequently, was that Suntuity had failed to present him with an equity participation agreement, which, per the Agreement, was required to be delivered to Mofid within sixty days of his start date. Mofid reminded Javan that was a contractual obligation and that he was disappointed that Javan had not taken that commitment seriously.

57.     In response, Javan told Mofid that the Agreement was "coming soon" and to be patient. (Mofid was never presented with the promised equity participation agreement.)

58.     The January 18th (2022) conversation with Javan concluded with Mofid agreeing to help Javan clean up the business, assist with organizational development and business process improvements, and to help hire a high-quality leadership team -- on the condition that Javan would act in a transparent and honest way. Mofid made clear that he would not tolerate dishonesty and a lack of integrity.

59.     Javan professed to be on board with Mofid's conditions to remain with the Company.

**Mofid's Efforts to Clean-up the Company**

60.     In the next 18 months, Mofid worked tirelessly to help clean up the Company focusing on implementing proper business processes and hiring effective leadership. Specifically, Mofid addressed the fact that there were no robust back-office IT systems, no effective inventory management and accounting systems, no departmental budgets, no financial statements, no understanding of Cost of Sales or Cost of Goods Sold.

61.     Step by step, Mofid brought professionalism to the business through the establishment of formalized business planning and business review meetings, financial review, and IT meetings, including urging Javan to hold regular staff meetings. Mofid also helped establish

variety of critical business key performance indicators (KPI's) to be regularly reported on and reviewed.

62.     Further, he helped build a professional leadership team by championing and helping hire critical leadership talent including Chief Financial Officer, Chief Administrative Officer, VP of Sales, and Head of IT.  Mofid worked tirelessly to create a professional organization and to lay the foundation for a much more effective and high-performing company. Mofid also pushed for implementation of a strategic planning process including organizing and managing 3-4 senior leadership offsite sessions per year to ensure management alignment and to create a culture of open communication, accountability, and teamwork.

63.     Mofid also insisted that the Company hire reputable accountants to prepare proper financial statements, to provide Financial Planning and Analysis, and have audited financial statements in place.

64.     While working with Javan and the rest of the management team to lay a proper foundation for the Company and address the gaps, Mofid interviewed and brought onboard an investment banking firm to address the Company's growth capital needs.

65.     Mofid's success in engaging an investment banking firm paved the way for the Company to meet with many potential investors and to explore options on how to strengthen its balance sheet. Although Javan was presented with a number of investment possibilities, he chose to pursue a path towards becoming a public company through a de-SPAC transaction.

66.     In May 2023, the Company signed a business combination agreement with Beard Energy Transition Acquisition Corporation ("Beard").  Upon closing of that transaction planned for later in the year, the Company would then become a publicly traded firm.

67.     On May 19, 2023, Beard issued a press release, stating in part, "Suntuity, a leading provider of renewable energy solutions and Beard Energy Transition Acquisition Corp., a special purpose acquisition company have entered into a definitive agreement that would result in the combined company being publicly traded."

68.     The Press release also stated that pursuant to the business combination agreement, Beard will acquire Suntuity for a pre-money equity value of $190 million.

69.     Business Wire reported about the business combination, the "pro forma enterprise value of the combined company is expected to be $249 million, with the transaction generating up to approximately $255 million in gross cash proceeds, in each case assuming no redemptions by Beard's public stockholders. In connection with the transaction, Suntuity has already raised $15 million in funded debt financing."

70.     Between May 2023 and September 2023, the Company focused on the merger transaction, including completing the required audited financial statements.

71.     In the meantime, the Company was struggling to meet its performance and growth projections to the SPAC (Beard) organization. Furthermore, due to historical lack of investment by the Company in core capabilities in the business in the areas of IT, ERP, and finance, and especially in inventory management and controls it was having extreme difficulty producing audited financials in a timely manner in support of the de-SPAC transaction.

72.     Javan's highly ineffective leadership style was also continuing to drive substantial turnover in the organization which negatively impacted the Company's overall ability to perform. In the two years that Mofid was at Suntuity, the Company went through three heads of Finance, at least three VPs of Sales, at least two heads of IT, at least three VPs of operations, and incredibly high levels of turnover at lower levels as well.

73.     Although Mofid had worked tirelessly for months to guide the Company to establish effective business processes, appropriate KPI's, focusing on critical and well-defined improvement initiatives, and help build a cohesive high quality leadership team, these efforts proved to be only marginally successful given Javan's toxic leadership style and massive employee turnover at the Company.

### The Termination of Mofid's Employment and the Company' Breach of the Agreement

74.     In early September 2023, Javan told Mofid that he was going to terminate Mofid's employment due to his desire to reduce costs. He stated to Mofid that the termination was not performance related, and that he was willing to pay "some severance."

75.     The amount offered by Javan in severance was a fraction of the amount due per the Agreement. Mofid refused.

76.     A few weeks later, during a conversation on September 16, 2023, a Saturday, Javan told Mofid that he "wants him off the payroll on Monday."

77.     Javan told Mofid that David Weinstein, Javan's personal attorney and the Company's acting general counsel, would send him severance documents to review over that same weekend. Mofid did not receive anything over the weekend.

78.     On September 21, 2023, the Company (via a call with Director of HR and David Weinstein) informed Mofid that his employment was terminated effective immediately and the Company "will meet its contractual obligations to him."

79.     The next day (on September 22, 2023), the Company's HR director sent Mofid a letter confirming the termination and stating, "Pursuant to the terms of your offer letter dated October 1, 2021 (the "Offer Letter") you have rights to the reserved RMIU's in the Company in the amount of 0.5% (one-half percent). In addition, you are to receive severance pay for one

18

year of your current gross base annual salary of $360,000 which will be paid to you bi-weekly and is subject to federal, state and local taxes, including FICA for the next 12 months, as well as continuation of Company-offered health benefits for that one year upon completion of your COBRA materials …"  (A copy of the Severance Letter is annexed hereto as **Exhibit B**.)

80.     Shortly after Mofid's termination, in October 2023, the Company sent him a series of confusing and inconsistent emails about whether the severance amount would be paid in a lump sum, monthly or "salary continuance." Furthermore, the Company never followed through on its equity commitment to Mofid and erroneously stated that Mofid had 0.5% equity ownership in the business and not the promised 1%.

81.     Then, to make matters worse, despite its clear and explicit promise in the Agreement, reiterated in the Severance Letter, to pay Mofid one-year of severance, the Company (after making only two bi-weekly severance payments in October), informed Mofid that it could not afford to continue to make severance payments. The Company also told Mofid that it could not say whether he would ever be paid his severance.

82.     Like so many of the Company's prior misrepresentations, the Company's representation regarding its inability to make the severance payments was also false.

83.     While claiming inability to pay his severance payments in the form of salary continuance, the Company, in the period immediately after Mofid's termination, hired multiple highly compensated individuals such as a Chief Revenue Officer, SVP of Operations, VP Finance/Controller, a new General Counsel, and other hires at lower levels, and continued to advertise online for new positions.

84.     In addition, on information and belief, Javan also leased or purchased a new private plane for himself.

85.     Therefore, despite spending lavishly on new hires, the Company continues to fail and refuses to pay Mofid the severance amount, or confirm his correct equity intertest in the Company, leaving Mofid no choice but to commence this lawsuit.

86.     A few weeks after Mofid's termination, the business combination with Beard also fell apart with Beard announcing on November 27, 2023, that it and Suntuity have "agreed to terminate their previously announced business combination agreement."

87.     On information and belief, Greg Beard, CEO of Beard Energy Transition Acquisition Corporation, who had planned to take the company public through a de-SPAC process (which was terminated in November) and had extended the company $15 million loan, has taken over the control of the company as of December 19, 2023.

88.     With the Beard takeover, this should trigger a "Change of Control" event under the Agreement, meaning that the Company will be required to pay Mofid the value of his 1% equity interest.

89.     The value of the Company based on an analysis performed by Beard Energy Transition Acquisition Corporation and publicly stated during the Company's May 2023 news release was pre-money equity value of $190 million.

### FIRST CAUSE OF ACTION
(Breach of Contract Against Suntuity)

90.     Plaintiff repeats and realleges the allegations in paragraphs 1 through 89 as though fully set forth herein.

91.     There is a valid and enforceable agreement between Mofid and the Company, which includes, among other provisions, the Company's promise to pay Mofid one year of severance and to award him a 1% vested equity interest in the Company.

92.     The Severance Letter confirmed the Company's obligation to pay severance.

93.     Plaintiff fully performed the Agreement.

94.     Plaintiff was not terminated for cause.

95.     The Company breached the Agreement by: (i) failing to pay Plaintiff one year of severance; and (ii) advising him that he is entitled to a .5% equity interest instead of a 1% equity interest in the Company.

96.     Plaintiff has been damaged in an amount to be determined at trial but estimated to be in excess of $ 1 million dollars.

## SECOND CAUSE OF ACTION
(Breach of Covenant of Good Faith and Fair Dealing)

97.     Plaintiff repeats and realleges the allegations in paragraphs 1 through 96 as though fully set forth herein.

98.     Defendants obstructed, undermined, and worked in opposition to Plaintiff's ability to fulfill the Agreement.

99.     Defendants' actions have prevented Plaintiff from receiving the fruits of the Agreement.

100.    Plaintiff has been damaged in an amount to be determined at trial but estimated to be in excess of $ 1 million dollars.

## THIRD CAUSE OF ACTION
(Fraudulent Inducement Against Javan)

101.    Plaintiff repeats and realleges the allegations in paragraphs 1 through 100 as though fully set forth herein.

102.   Javan personally made a series of material misrepresentations of present facts concerning Suntuity's business condition and operations to Mofid before Mofid joined Suntuity.

103.   Javan made misrepresentations to Mofid with knowledge of their falsity.

104.   Javan intended for Mofid to rely on his misrepresentations.

105.   Plaintiff relied on Javan's misrepresentations by, among other things, terminating his paid advisory agreement with his prior employer and halting negotiations of other offers.

106.   As a result, Plaintiff has suffered damages in an amount to be proven at trial.

## FOURTH CAUSE OF ACTION
(Declaratory Judgment Against Suntuity)

107.   Plaintiff repeats and realleges the allegations in paragraphs 1 through 106 as though fully set forth herein.

108.   There is an actual controversy between Mofid and the Company concerning Mofid's equity interest in the Company.

109.   Plaintiff's position is that he is entitled to a 1% equity interest in the Company based on the terms of the Agreement.

110.   The Company has stated that Plaintiff has only a .5% equity interest in the Company.

111.   When there is closing of a change of control event, Plaintiff will be paid for his equity interest in the Company.

112.   On information and belief, a change of control event has taken place.

113.   A justiciable controversy exists regarding Plaintiff's equity interest in the Company.

4882-2085-9032, v. 1

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff pray that the Court enter judgment against Defendants as follows:

(i)     On the First Cause of Action, damages in an amount to be proven at trial but estimated to be in excess of $1 million dollars;

(ii)    On the Second Cause of Action, damages in an amount to be proven at trial but estimated to be in excess of $1 million dollars;

(iii)   On the Third Cause of Action, damages in an amount to be proven at trial;

(iv)    On the Fourth Cause of Action, a declaration that Plaintiff has a 1% equity interest in the Company; and

(v)     All other relief that the Court deems just and proper.

Dated: December 20, 2023

**PASHMAN STEIN WALDER HAYDEN, P.C.**

*By: /s/ Dennis Smith*
Dennis Smith, Esq. (026931988)
Court Plaza South
21 Main Street # 200
Hackensack, New Jersey 07601
(201) 270-4907
dsmith@pashmanstein.com

## **PLAINTIFF'S DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury in this action of all issues so triable.

23

4882-2085-9032, v. 1

**LOCAL CIVIL RULE 11.2 VERIFICATION**

Pursuant to Local Rule 11.2, Plaintiff hereby verifies that, to his knowledge, the matter in controversy is neither the subject of any other action pending in any court, nor of any pending arbitration or administrative proceeding.

**PASHMAN STEIN WALDER HAYDEN, P.C.**

By: *Dennis Smith*
Dennis Smith, Esq. (026931988)
Court Plaza South
21 Main Street # 200
Hackensack, New Jersey 07601
(201) 270-4907
dsmith@pashmanstein.com

24

## VERIFICATION

I, Kamyar Mofid, hereby verify that:

1. I am the Plaintiff in the above matter.

2. I have reviewed the foregoing Verified Complaint.

3. I verify under the penalty of perjury that the facts set forth in the Verified Complaint are true and correct to the best of my knowledge.

Executed on this 20 day of December , 2023.

_____
KAMYAR MOFID

25

# EXHIBIT A

4882-2085-9032, v. 1



October 1, 2021

Mr. Kamyar Mofid
3052 N. Snow Canyon Pkwy
Unit 9
St. George, UT 84770

RE: Offer of Employment with Natural Power Sources LLC d/b/a Suntuity

Dear Kam:

It is my pleasure to offer you the position of Chief Strategy Officer ("CSO") with Natural Power Sources LLC d/b/a Suntuity and subsequently to Suntuity Group upon its formation in the near future (herein referred to as "Company"). This is a full-time, EXEMPT, salary position. The broader terms and conditions of employment will include those set forth in this letter as well as periodic Company business policy updates, as needed and required by law. The Company agrees to make the terms of this agreement binding upon the Suntuity Group upon its formation.

**Start Date and Location:** Your anticipated start date is Monday, October 11, 2021 (pending the completion of your pre-employment onboarding). You will have the option to work remotely with travel expectations as required by the Company; however, you will not be required to travel if such travel is restricted pursuant to a state department of health or CDC travel advisory or is deemed an unusually high risk as related to the Covid-19 pandemic.

**Responsibilities:** As CSO, you will collaborate with the CEO and have input and assist with the execution of strategic business decisions and initiatives.

**Special Considerations:** During your first twelve (12) months of employment with the Company, you will have the right of first refusal for the Chief Operations Officer ("COO") position with the Company if such a position is requisitioned by the Company.

**Compensation:** As CSO, your gross base annual salary will be $360,000.00. Additionally, as CSO, you will be eligible for an annual bonus of up to 50% of your base annual salary ("Annual Bonus"). As COO (if such position is offered and accepted), your gross base annual salary will be increased subject to mutual agreement with the Company. Similarly, as COO, you will be eligible for an increased Annual Bonus subject to mutual agreement with the Company. Annual Bonus will be based upon the achievement of goals mutually agreed upon with the CEO of the Company, to be determined within ninety (90) days from your start date. Annual Bonuses may be paid incrementally and may be based on milestone achievements or other key performance indicators or criteria, as established between you and the CEO. Annual Bonus payments for a given calendar year shall be paid by March 31 of the following year, and will be paid pro rata, depending on your start date.

You will also be eligible for equity participation for your role as CSO up to 1.00% (one percent) of the Suntuity Group in a class of shares of the Company's choosing and as outlined in Chart 1 below. The allocation and vesting schedule of such equity is dependent upon your actual position start date and tenure as CSO and will be formalized in an equity participation agreement within sixty (60) days of your start date in the position. You will not be entitled to any portion of allocated but not yet vested equity should you resign without good reason or



be terminated for cause from your employment with the Company, prior to the vest dates set forth in Chart 1 and Chart 2. For purposes of this Agreement, your resignation for a "good reason" shall mean the following: your resignation based upon (1) a material reduction in your duties, responsibility or authority; (2) a material failure by the Company to comply with a material term of this Agreement, which is subject to at least fifteen (15) days' notice by you and an opportunity for the Company to cure; (3) the failure of any successor or assign of the Company to assume the terms of this Agreement; or (4) a change of the principal office or work place assigned to you to a location different from its location immediately prior to such change. For purposes of this Agreement, your termination for "cause" shall mean the following: your termination for (1) misappropriation of Company funds; (2) conviction of a crime involving moral turpitude; (3) breach of your fiduciary obligations to the Company; or (4) gross negligence in the performance of your duties, that is not remedied upon receipt of notice thereof from the Company and a fifteen (15) day opportunity to cure.

**Chart 1 (CSO):**

| Equity Percentage | Days until Allocation (from actual position start date as CSO) | Vest Date (from actual position start date as CSO) |
|---|---|---|
| 0.5% (one half percent) | Day 1 | Day 366 |
| 0.25% (one quarter percent) | Day 366 | Day 731 |
| 0.25% (one quarter percent) | Day 731 | Day 1096 |

Should Suntuity offer, and if you accept, the position of COO, you will also be eligible for additional equity participation up to an additional 1.00% (one percent) of Suntuity Group in a class of shares of the Company's choosing and as outlined in Chart 2 below. The allocation and vesting schedule of such equity is dependent upon your actual position start date as COO and will be formalized in an equity participation agreement (or modification thereof) within sixty (60) days of your start date in the position of COO

**Chart 2 (COO):**

| Equity Percentage | Days until Allocation (from actual position start date as COO) | Vest Date (from actual position start date as COO) |
|---|---|---|
| 0.5% (one half percent) | Day 1 | Day 366 |
| 0.25% (one quarter percent) | Day 366 | Day 731 |
| 0.25% (one quarter percent) | Day 731 | Day 1096 |

The equity participation set forth above in Chart 1 and Chart 2 is cumulative. In other words, if Suntuity offers and you accept the position of COO, you will continue to receive the allocation of equity provided in Chart 1 in addition to the equity allocation provided in Chart 2. In that situation, you will be eligible for equity participation up to two percent (2.00%) of the Company. To be clear, however, the equity participation in Chart 2 is only available if Suntuity offers and you accept the role of COO.

**Change of Control.** Upon a change of control, which shall not include an organizational restructuring plan leveraging existing shareholders and beneficiaries, all unvested equity interests will vest on the closing of the change of control and be paid by the Company to you upon such closing. For the purposes of this agreement, "change of control" means (a) a new or an existing shareholder currently owning less than 10% of shares of the



Company becoming a majority shareholder, (b) the Company or any of its subsidiaries having an Initial Public Offering ("IPO"), or (c) the acquisition or divestiture of a business unit of the Company where the value of such acquisition or divestiture is in excess of 25% value of the Company, as such value is determined in the latest valuation made pursuant to IRS Code 409A.

**Indemnification.** The Company agrees to defend, indemnify and hold you harmless against any and all claims, damages, liabilities or costs ("Claims"), including attorneys' fees and defense costs, arising out of or in any way connected with the performance of the services contemplated in this Agreement, exclusive of any Claims that may arise from your gross negligence, or such other acts defined as "cause" in this Agreement.

**Payment of Salary,** Your salary will be paid bi-weekly and is subject to federal, state and local taxes, including FICA; all applicable taxes will be withheld from your salary at source as per the prevailing laws and regulations.

**Severance:** Should the Company terminate your employment without cause, or you resign for good reason, you will be eligible for severance pay equivalent to one year of your then current gross base annual salary, plus a continuation of then available Company-offered health benefits for that one year.

**Benefits:** As a full-time employee you will be eligible for paid time off ("PTO"). You will accrue up to twenty (20) PTO days for each year of full-time work with the Company. Additionally, you will accrue up to five (5) days of paid sick leave per calendar year and be eligible for additional paid leave, such as parental and bereavement, subject to applicable Company policy. Furthermore, you will be eligible to receive Holiday Pay, Medical, Dental, and Vision insurance beginning on the first of the month immediately following the completion of your first thirty (30) days with the Company. Your Medical, Dental and Vision insurance benefits will be fully paid by the Company. You will also be eligible to enroll in the Company's 401(k) program as per plan guidelines, and other benefits customarily offered to other senior executives. For a period of up to twelve (12) months from the start of your employment, the Company will reimburse you for your current COBRA payments, at which point you may choose to enroll in the Company's Medical plan.

**Confidentiality Agreements:** During your employment, you will have access to certain proprietary information including customer prospect lists, projects, pricing, customer project details and needs, research and development and other confidential information of both the Company and its customers. You will hold in trust and not disclose to any party, directly or indirectly, during your employment with the Company and thereafter, such confidential information. As a condition of employment, you will be required to sign the Company's standard Proprietary Information, Inventions and Non-Compete Agreement (a copy of which is attached) and any updates to such agreement(s) as the Company may deem necessary. In addition to these corporate policies, you are subject to all personnel policies issued by the Company from time to time, including those set forth in the Company handbook (as amended).

**Employment at Will:** All the terms of your employment as stated herein shall come into effect with your start date and is an at will agreement. Please note, employment with the Company will be governed by, construed, and enforced in accordance with all Federal, State, and local laws and legislation regarding employment. Accordingly, either party can terminate this agreement without cause or reason at any given time without advance notice, subject to other provisions of this agreement. The Company may require a transition period not to exceed three (3) months should you anticipate that your employment will end due to voluntary reasons. We ask that you provide adequate notice to allow for the transition.

**Non-Solicit and Non-Compete:** As a condition of your employment, you covenant agree to the company's non-



solicit and non-compete policy. Besides this policy, you are subject to all personnel policies issued by the company from time to time, including those set forth in the company handbook (as amended).

**Dispute:** Any dispute arising out of your employment with the company will be governed by and construed and enforced in accordance with the laws of the State of New Jersey in the United States of America without reference to its conflicts of law statutes. You hereby submit to the jurisdiction of the courts of the State of New Jersey and the United States District Court of New Jersey.

Your prior employer(s) may have obligated you to certain non-compete, non-solicit, and/or confidentiality requirements in the event of the termination of your employment with that employer. Your employment with Suntuity does not relieve you of any validly enforceable contractual obligations to your prior employer(s). Suntuity expects that you will fully comply with all such obligations.

Please note this offer is contingent upon your timely start of work, receipt of a satisfactory background screening, as well as attestation and proof of eligibility to work within the United States of America. Please respond with your written acceptance of this offer by October 4, 2021.

We welcome you to the Suntuity family and look forward to a strong and fruitful relationship.

Sincerely,

Natural Power Sources LLC d/b/a Suntuity

Agreed and Accepted

Shadaan Javan, CEO

Kamyar Mofid     Oct. 4, 2021



## EXECUTIVE EMPLOYMENT COVENANTS

Incorporated into this document are the terms, conditions and definitions contained in that certain letter dated October 1, 2021 from Natural Power Sources LLC d/b/a Suntuity to Kamyar Mofid containing an employment offer ("Offer Letter").

As a condition of employment by Natural Power Sources LLC d/b/a Suntuity (the "Company"), as well as the compensation and benefits provided by the Company, Kamyar Mofid ("Executive" or "You") agrees to the following covenants:

1. Confidential & Proprietary Information.

   a. Executive acknowledges that the Company has developed, received, compiled and owns certain proprietary techniques and confidential information that have great value in its business ("Confidential Information"). Confidential Information includes but is not limited to any and all information (in any medium, including but not limited to, written documents and electronic files) concerning unpublished financial data, marketing, product and system development, operating procedures and methods, business plans, strategies, forecasts, processes, know how, techniques, specifications, technologies, trade secrets, inventions, discoveries, improvements, data, customer and prospective customer lists, pricing and costs, customer and prospective customer information, supplier and vendor identities, characteristics and agreements and information concerning Company's employees, customers, partners, products, services, and operations.

   b. Executive acknowledges that Company will provide Executive with access to Confidential Information pertaining to persons or entities for whom or with whom Company performs services or obtains information ("Customers"). Confidential Information includes not only information disclosed by Company or its Customers to Executive during Executive's employment with Company, but also information developed or learned by Executive during Executive's employment with Company. Executive agrees that such Confidential Information shall have the broadest definition permitted by law for the exclusive benefit of Company.

   c. Executive covenants to (i) hold in trust, keep confidential, and not disclose to any third party or make any use of the Confidential Information of Company or its Customers; (ii) not cause the transmission, removal or transport of Confidential Information of Company or its Customers; and (iii) not publish, disclose, or otherwise disseminate Confidential Information of Company or its Customers except as otherwise required under applicable law or without Company's prior written consent.

2. Inventions & Intellectual Property.

   a. Executive agrees that all documents, software, systems or designs, technologies, processes, programs, disks, tapes, marketing materials, and any other materials ("Materials") created in whole or in part by Executive during the course of or related to



providing services for the Company shall be treated as a "work for hire" for the Company. Executive will promptly disclose to the Company all discoveries, inventions, ideas, concepts, enhancements, improvements and similar creations ("Creations") made by Executive. Executive also agrees that all ownership of any Materials or Creations shall be assigned to and vest exclusively with the Company. Executive acknowledges that the compensation Executive is receiving from the Company includes compensation for assigning all intellectual property rights that may arise in the course of Executive's performance of services for the Company.

3. Non-Competition.

    a. Executive agrees that while employed by the Company, and for a period of one (1) calendar year following the end of Executive's employment by the Company, Executive will not directly or indirectly compete with the Company in any manner, and further agrees that Executive will not directly or indirectly engage in any business, either individually or as an officer, director, employee, contractor, consultant, shareholder, partner, member, or owner of any individual or entity, which is competitive with the Company within a one hundred (100) mile radius of any Company office. For purposes of this Agreement, "competitive with" shall mean the development, procurement, installation of photovoltaic systems including, but not limited to, residential, commercial, and utility projects ("PV Services"), or any other core lines of business associated with the Company.

    b. Executive agrees that for a period of one (1) calendar year following the end of Executive's employment with the Company, for whatever reason, Executive will not directly or indirectly, without Company's prior written consent, render services or advice to any person, trust, partnership, corporation, or any other entity for whom the Company: (i) rendered PV Services during the twelve (12) month period preceding the termination of Executive's employment; or (ii) made a written proposal for PV Services during the twelve (12) month period preceding the termination of Executive's employment.

4. Non-Solicitation.

    a. Executive agrees that, while employed by the Company, and for the period of one (1) calendar year following the end of Executive's employment with the Company for whatever reason, Executive will not directly or indirectly solicit or retain the services of any individual as an officer, director, partner or employee, if that individual is at the time a Company officer, director or employee or was a Company officer, director or employee at the time Executive's employment for the Company ended.

    b. Executive specifically agrees that, while employed by the Company, and for the period of one (1) calendar year following the end of Executive's employment with the Company for whatever reason, Executive will not directly or indirectly, induce or attempt to induce any employee of the Company to leave the Company.



c.  Executive agrees not to solicit, indirectly or directly, for Executive's own benefit or that of any other person or entity other than the Company, any customers of the Company during the time Executive is employed by the Company and for one (1) calendar year following the end of Executive's employment for whatever reason.

d.  Executive agrees not to accept or steer business from any customers of the Company for Executive's own benefit or that of any other person or entity other than the Company during both the time Executive is employed by the Company and for one (1) calendar year following the end of Executive's employment for whatever reason.

e.  Executive agrees that during the time Executive is employed by the Company and for one (1) calendar year following the end of Executive's employment for whatever reason, Executive will not induce or attempt to induce any supplier, licensee, vendor, or any other business relation of the Company to cease doing business with the Company or in any way interfere with the relationship the Company has with any such supplier, licensee, vendor, or any other business relation.

5.  <u>Non-Circumvention & Non-Interference.</u>

a.  Executive agrees that without consent from the Company, and while Executive is an employee of the Company,  the Executive will not enter, either directly or indirectly, into any discussions, solicit or accept offers, enter into any agreements, conduct negotiations with or otherwise engage in any other independent communications unrelated to the Company's business with: any third party to whom Executive was introduced to by any member, shareholder, officer, director, employee, agent, customer, supplier, vendor, or other representative of the Company; any third party to whom Executive was informed of by any member, shareholder, officer, director, employee, agent, customer, supplier, vendor, or other representative of Company, or any Executive, financial partner, investor, contractor of the Company. For purposes of this Agreement, "Representatives" means, as to Company, its affiliates, and respective consultants (including attorneys, financial advisors, and accountants). Further, after termination of Executive's employment with the Company, Executive will not take any action or omit to take an action intended to interfere with existing contractual and or business relationships with the Company in a manner prohibited by law or this Agreement.

6.  <u>Reasonable Restrictions.</u> Executive acknowledges that the restrictions contained in this Agreement are reasonable and necessary to protect Company's legitimate business interests and rights which include, but are not limited to, its relationships with its customers and its Confidential Information, name recognition, market presence, and goodwill.

7.  <u>Injunction & Equitable Relief.</u> Executive acknowledges that Executive's breach of any provision of this Agreement would cause irrevocable harm to the Company, incapable of compensation by the award of money damages. Therefore, in the event of a breach or threatened breach of this Agreement, Company shall be entitled to injunctive and equitable relief (without the necessity of proving any actual damage or that monetary damages would not afford an adequate remedy). In



the event of any breach of the non- solicitation or non-competition prohibitions noted above, the duration of such prohibitions shall be extended by the period of the duration of the breach, provided that the duration of such extension shall not be less than six months from the date Executive ceases to engage in those acts which constitute a violation of this Agreement. Nothing contained herein shall be construed as prohibiting Company from pursuing any other remedies available for any breach or threatened breach.

8. <u>Waiver.</u> The failure of the Company to insist upon the strict performance of the restrictions and covenants contained in this Agreement shall not be deemed a waiver of the Company's right to insist upon the strict performance of such restrictions and covenants at any other time.

9. <u>Severability.</u> In the event any provision of this Agreement shall be held to be invalid or unenforceable for any reason (including geographic or business scope or duration thereof), such invalidity or unenforceability shall attach only to such provision and shall not affect or render invalid or unenforceable any other provision of this Agreement, and this Agreement shall be construed as if such invalid or unenforceable provision had been more narrowly drawn so as not to be invalid or unenforceable.

10. <u>Immunity from Liability.</u> Pursuant to the Defend Trade Secrets Act of 2016, an individual shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that is made in confidence to a Federal, State, or local government official or to an attorney solely for the purpose of reporting or investigating a suspected violation of law. An individual shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal. An individual who files a lawsuit for retaliation by an employer for reporting a suspected violation of law may disclose the trade secret to the attorney of the individual and use the trade secret information in the court proceeding, if the individual files any document containing the trade secret under seal, and does not disclose the trade secret, except pursuant to court order.

11. <u>General Provisions.</u>

   a. This Agreement and all questions relating to its validity, interpretation, performance or enforcement shall be governed by and construed in accordance with the laws of the State of New Jersey, without regard to choice of law principles, regardless of where Executive's work is performed, and any litigation shall be brought in the state or federal courts of the State of New Jersey, unless otherwise agreed by the parties. Executive agrees to the exercise of personal jurisdiction over Executive by such New Jersey state or federal courts and expressly waives any objection to such personal jurisdiction.

   b. This Agreement shall be binding upon and inure to the benefit of the Company and its successors and assigns and shall be binding upon Executive.

   c. This Agreement, together with the Offer Letter contains the entire understanding between the parties with respect to the subject matter hereof and supersedes all prior or



contemporary agreements with respect to the subject matter hereof. This Agreement may not be modified or amended other than in writing signed by Executive and the Company.

12. <u>Disclosure of Additional Relationship</u>. Executive has disclosed to Company that he has an existing relationship with a lithium battery developer and manufacturer in China ("Battery Company"). Executive has disclosed that this relationship will continue during employment with Company and both parties desire that some type of mutually beneficial synergistic relationship develop in the future between Company and Battery Company. Company consents to the continuing relationship between Executive and Battery Company and disclaims any proprietary interest in such relationship or any other entities, interests, or profits which might flow from the relationship.

The parties agree that the current and continuing activities of Executive relating to Battery Company do not constitute a violation of terms of these Executive Employment Covenants or the Offer Letter.

IN WITNESS WHEREOF, and intending to be legally bound, the parties execute this Agreement.

Kamyar Mofid

Oct. 4, 2021

Dated

Natural Power Sources LLC

Shadaan Javan, CEO

October 4th, 2021.

Dated

# EXHIBIT B

4882-2085-9032, v. 1



September 22, 2023

Mr. Kamyar Mofid
3052 N. Snow Canyon Pkwy
Unit 9
St. George, UT 84770

RE: Separation from Suntuity Renewables, LLC

Dear Mr. Mofid:

As was conveyed to you yesterday Suntuity Renewables, LLC (the "Company") made the decision to terminate your employment with the Company effective today, September 22, 2023 (the "Separation Date").

Pursuant to the terms of your offer letter dated October 1, 2021 (the "Offer Letter"), you have rights to the reserved RMIUs in the Company in the amount of 0.5%. (one-half percent). In addition, you are to receive severance pay for one year of your current gross base annual salary of $360,000.00 which will be paid to you bi-weekly and is subject to federal, state and local taxes, including FICA for the next 12 months, as well as a continuation of Company-offered health benefits for that one year upon completion of your COBRA materials, which are enclosed herewith and which must be returned as soon as possible to the Cobra administrator in order to avoid any lapse in coverage.

Finally, you will receive a separate check on Monday for your remaining PTO balance of $14,447.40 via UPS to your address on file.

We thank you for your service and wish you the best.

Sincerely

Gene Hallenbeck, Director of HR
Suntuity Renewables LLC